**UNITED STATES of America,
Plaintiff,**

v.

**Michael Paul JOHNSON, Defendant.**

No. 4:07–cr–00127.

United States District Court,
S.D. Iowa,
Central Division.

Dec. 4, 2008.

J. Keith Rigg, J. Keith Rigg Attorney at Law, Des Moines, IA, for Defendant.

Craig P. Gaumer, U.S. Attorney's Office, Des Moines, IA, for Plaintiff.

## SENTENCING MEMORANDUM OPINION AND ORDER

ROBERT W. PRATT, Chief Judge.

Before the Court is the matter of sentencing Michael Paul Johnson ("Defendant"). This memorandum opinion and order supplements the findings made on the record at the sentencing hearing held on November 17, 2008. Clerk's No. 48.

## I. PROCEDURAL BACKGROUND

On May 8, 2007, the Government filed a four-count indictment against Defendant. Clerk's No. 2. The first three counts related to Defendant's receipt, possession, and distribution of visual depictions of minors engaging in sexually explicit conduct in violation of 18 U.S.C. §§ 2252(a)(2) and (4)(b). *Id.* The fourth count was a criminal forfeiture count pursuant to 18 U.S.C. § 2253. *Id.* On September 28, 2007, Defendant entered into a plea agreement with the Government in which Defendant pleaded guilty to Count Two of the Indictment, which charged him with knowingly receiving visual depictions of minors en-

gaging in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2). Clerk's No. 23. In accordance with the terms of the plea agreement and on the Government's motion, the Court now dismisses Counts One and Three. In response to Count Four, this Court will enter a final criminal forfeiture order having entered a preliminary criminal forfeiture order on October 24, 2007. Clerk's No. 29. Thus, the only matter presently before the Court is what sentence is sufficient, but not greater than necessary, for Defendant's conviction.

## II. FACTS

### A. *Defendant's Criminal Conduct*

In the plea agreement, the parties stipulated to the following facts concerning the criminal conduct relevant to the matter before the Court. From January 2003 through January 2004, Defendant, while residing in Ankeny, Iowa, received visual depictions of minors engaged in sexually explicit conduct using his internet connection and personal computer. Plea Agreement Attach. A ¶ 1. More specifically, Defendant, using a peer-to-peer, file-sharing program called Limewire, on approximately 300 occasions, downloaded and stored more than 600 such depictions. *Id.* ¶¶ 6–8. Defendant knew that these depictions were of minors engaged in sexually explicit conduct. *Id.* ¶ 11. As a peer-to-peer, file-sharing program, Limewire enabled other users to access and copy these images, as demonstrated by the manner in which Defendant's criminal conduct was discovered—an FBI agent searched on Limewire

using the keyword "pedofilia" and identified three images depicting minors engaged in sexually explicit conduct available through an internet protocol (IP) address registered to Defendant. *Id.* ¶¶ 2–4. A subsequent search of Defendant's home and personal computer uncovered the illegal images. *Id.* ¶ 6.

### B. *Defendant's Pre–Indictment Conduct*

The FBI seized Defendant's computer during its search on January 23, 2004. *Id.* ¶ 5. However, Defendant was not charged until May 2007. During the three-year period, Defendant completed medical school at Des Moines University and a one-year medical residency in Michigan. Presentence Investigation Report ("PSR") ¶¶ 65, 68. There is no evidence that Defendant engaged in criminal behavior—of a sexual nature or otherwise—during this period. In fact, Defendant has no criminal convictions in his history.[1] He appears to have been a productive member of society and to have maintained a stable household. In March 2006, Defendant's wife gave birth to their first and only son who suffers from agenesis of the corpus callosum, a rare birth defect that may give rise to symptoms including the following: intellectual retardation, seizures, excess cerebrospinal fluid, or difficulties in motor function. *Id.* ¶ 44. By all accounts, Defendant has been a loving husband to his wife and father to his son. *Id.* ¶ 45. Once indicted, Defendant seems to have satisfied all of the conditions of his supervised release.

### C. *Defendant's Mental Health*

Defendant's proffered expert, Dan L. Rogers, Ph.D. ("Rogers")[2], conducted a

---

1. Defendant's only interaction with law enforcement involved some dismissed 1992 check forgery charges. PSR ¶¶ 35–38.

2. Rogers is a distinguished psychologist. He graduated from Arizona State University with a Ph.D. in Clinical Psychology in 1975. Vita of Dan Loren Rogers ("Vita") at 1. Since then, he has spent decades working with patients,

providing evaluations, consulting with state agencies and private groups, teaching at various academic institutions, publishing papers, managing other counselors, and otherwise holding various positions of leadership. *Id.* at 1–4. His experiences include not only a fellowship and an internship at the Mayo Clinic, but also an offer to join the staff. Tr. at 4–5. Additionally, Rogers has extensive profession-

psychological examination of Defendant lasting over six hours. Rogers reached several conclusions based on his examination, considered in light of the facts contained in the pre-sentence investigation and those stipulated to in the plea agreement. The Court received a copy of Rogers' Psychological Assessment Report ("Psych Report") of Defendant and heard from Rogers who explained his findings at Defendant's sentencing hearing. Rogers concluded that Defendant does not meet the diagnostic criteria for pedophilia but found that Defendant is afflicted with several disorders, including mild bipolar affective disorder and depressive personality. Psych Report at 5. He attributed Defendant's interest in pornography to the "compulsive, obsessive aspects of bipolar disorder [rather] than [a] strong preference for pornography." *Id.* Rogers concluded that Defendant was depressed at the time he began to view pornography depicting adults but could not speak to Defendant's mental state when he first viewed pornography depicting children because the first occurrence of this behavior is not clear. Tr. at 24. Rogers concluded that Defendant's risk of reoffense is "very low," relying (1) on low statistical recidivism rates, generally, for pornography offenders and (2) on the fact that Defendant does not display the primary risk factors for further offense, such as antisocial personality, major psychosis, a desire to financially profit from pornography, or substance addiction. Psych Report at 5.

In response to Rogers' conclusions, the Government attempted to undercut the reliability of his opinion on cross examination. The Government first brought out the fact that Rogers had never seen the underlying photographs in this case. Tr. at 20. The Government also highlighted

the fact that Defendant derived at least some sexual pleasure from the photographs as he admitted to masturbating frequently to photos of several girls who resembled his former classmates. Tr. at 23. Further, the Government pointed out that Defendant was not fully aware of his treatment needs, even though Defendant admitted he needed help. Tr. at 27–28. Finally, the Government questioned Rogers about the recidivism statistics of child pornographers. Rogers testified that "[t]he best data there are indicates that it's a very low recidivism rate for individuals whose only offense is child pornography, possession, or distribution," despite the general lack of reliable scientific studies on the subject. Tr. at 20–21.

The Government also furnished the Court with a presently unpublished study entitled, "The 'Butner Study' Redux: A Report of the Incidence of Hands-on Child Victimization by Child Pornography Offenders" ("Butner Study" or "Study"). This Study set out to determine whether a group of men who had been convicted of possessing, receiving, or distributing child pornography, but who had no known history of "hands-on" sexual abuse, were "merely" collectors of child pornography or, alternatively, whether this group actually had committed "hands-on" sexual abuse. The Study concluded that the collectors of child pornography were "more likely than not to have sexually abused a child via a hands-on act" based on rather startling data. Butner Study at 2. The Study found that 85% of collectors admitted to having previously abused children and that only 2% of collectors who still denied abusing children could pass a lie detector test on that question. *Id.* at 18.

al experience in the area of sexual deviance, including that of child pornography. Vita at 1–4. In fact, Rogers first began conducting

examinations of child pornographers over 30 years ago. Tr. at 7.

Rogers was provided a copy of the Study and was able to comment on its merits. The Government has offered this Study, at a minimum, as an indication that recipients of child pornography are dangerous individuals and, possibly, to suggest that Defendant has committed a sexual assault against a child in the past.[3] *See* Pl.'s Sentencing Mem. at 22. The Court will elaborate on this Study and the weight the Court assigns to it in discussion to follow.

### III. LAW

The Supreme Court held in *United States v. Booker* that the mandatory nature of the sentencing guidelines system violated the Sixth Amendment of the United States Constitution. 543 U.S. 220, 226–27, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). To remedy this, the Supreme Court modified the federal sentencing statute to make the sentencing guidelines truly guidelines—advisory, but not binding on the sentencing court. *Id.* at 245, 125 S.Ct. 738. Subsequent litigation has affirmed the authority of the sentencing court to sentence within the range of choice dictated by the facts and applicable law of the case before it. *See Gall v. United States,* — U.S. ——, 128 S.Ct. 586, 602, 169 L.Ed.2d 445 (2007) (upholding a sentence outside the advisory guideline range as reasonable); *Kimbrough v. United States,* — U.S. ——, 128 S.Ct. 558, 570, 169 L.Ed.2d 481 (2007) (noting that sentencing courts may vary from the advisory guideline range based solely on policy considerations, including disagreement with the policy underlying the guidelines in a case); *Rita v. United States,* 551 U.S. 338, 127 S.Ct. 2456, 2465, 168 L.Ed.2d 203 (2007)

(stating that a district court may consider arguments that "the Guidelines sentence itself fails to properly reflect [18 U.S.C.] § 3553(a) considerations"). The result of this development in sentencing law is that sentencing courts must "take account of" the advisory guideline range as part of all the sentencing goals and factors enumerated in 18 U.S.C. § 3553(a), but are no longer bound by the sentencing range indicated by the applicable guideline in the case. *Cunningham v. California,* 549 U.S. 270, 287, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007); *Booker,* 543 U.S. at 261, 125 S.Ct. 738.

The advisory guidelines are, therefore, "the starting point and the initial benchmark" in determining a sentence. *Gall,* 128 S.Ct. at 596 (stating that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range"). While district courts must "give respectful consideration to the Guidelines," they are permitted " 'to tailor the sentence in light of other statutory concerns as well.' " *Kimbrough,* 128 S.Ct. at 570 (quoting *Booker,* 543 U.S. at 245–46, 125 S.Ct. 738). "[T]he Guidelines are not the only consideration, [and] the district judge should consider all of the § 3553(a) factors" to fashion the appropriate sentence. *Gall,* 128 S.Ct. at 596. As required by the Sentencing Reform Act, the "overarching provision instruct[s][the] district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing, including 'to reflect the seriousness of the offense,' 'to promote respect for the law,' 'to provide just punishment for the offense,' 'to afford adequate deterrence to criminal conduct,' and 'to protect the public from further

---

**3.** While the Government never explicitly argued that Defendant has personally sexually assaulted a child, the Government seems to implicitly take this position, arguing its brief: "[The Butner Study] shows that the Defendant is statistically more likely than not to

have actually committed an act of child sexual abuse.... [T]he study suggests that the Court should not give any substantial weight to the fact that the Defendant has not been discovered to have committed a hands-on child sex offense." Pl.'s Sentencing Mem. at 22.

crimes of the defendant.'" *Kimbrough,* 128 S.Ct. at 570 (quoting 18 U.S.C. § 3553(a)).

In determining the sentence that is "sufficient, but not greater than necessary," the statute further directs the sentencing court to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the sentencing range and any pertinent policy statements issued by the Sentencing Commission, the kinds of sentences available, the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a); *accord Kimbrough,* 128 S.Ct. at 570. The sentencing court "may not presume that the Guidelines range is reasonable," but rather must "make an individualized assessment based on the facts presented" to arrive at a sentence that is sufficient, but not greater than necessary, in a given case. *Gall,* 128 S.Ct. at 597. While the rationale for a non-guideline sentence will necessarily be more detailed the further the deviation from the advisory guideline suggested by the Sentencing Commission, there is no legal requirement that "extraordinary circumstances" are a prerequisite to imposition of a non-guideline sentence. *Id.* The sentencing judge has a greater familiarity with an individual case than either the Sentencing Commission or the Court of Appeals, and is "therefore, 'in a superior position to find facts and judge their import under § 3553(a)' in each particular case." *Kimbrough,* 128 S.Ct. at 574 (quoting *Gall,* 128 S.Ct. at 597).

## IV. ANALYSIS

### A. *Advisory Guideline Calculation*

Notably, the parties have agreed that the sentencing guidelines in effect at the time of Defendant's criminal conduct, not those in effect at the time of his prosecution, should be applied to avoid *ex post facto* concerns. The Court agrees. Under the guidelines in effect in 2004, Defendant's base offense level under the advisory sentencing guidelines is 17. *See* U.S.S.G. § 2G2.2(a)(1). Because the material involves a minor under the age of twelve, two levels are added. *See id.* § 2G2.2(b)(1). Five levels are added because the offense involved distribution for the receipt, or expectation of receipt, of a thing of value, though not pecuniary gain. *See id.* § 2G2.2(b)(2)(B). Four levels are added because the material portrays sadistic, masochistic conduct or other depictions of violence. *See id.* § 2G2.2(b)(3). Two levels are added because the offense involved the use of a computer for the possession, transmission, receipt, or distribution of the material. *See id.* § 2G2.2(b)(5). Finally, five levels are added because the offense involved at least 600 images. *See id.* § 2G2.2(b)(7)(D). The Court finds that a two-level reduction for acceptance of responsibility is warranted in light of Defendant's timely guilty plea, and the Government has also moved for application of an additional, one-level reduction for acceptance of responsibility. *See id.* §§ 3E1.1(a), (b). Defendant's total offense level is, therefore, 32. Defendant has no prior criminal history points, resulting in a criminal history category of I. The resulting advisory sentencing range of imprisonment is 121 to 151 months.

### B. *18 U.S.C. § 3553(a) Factors*

The Court's duty is to impose a sentence that is "sufficient, but not greater than necessary" after considering all the factors set forth in the sentencing statute, 18 U.S.C. § 3553(a). One of the factors the Court must consider is the need for the sentence imposed to reflect the seriousness of the offense. Child pornography offenses are very serious. Many child vic-

tims will never live a normal life. As the Government notes in its sentencing memorandum, the market for such images helps foster conduct that is punishable by life in prison in many states for the crimes that are inflicted on children to create the images. Thus, strict punishments are generally necessary to reflect this seriousness, as well as to promote respect for the law, to provide just punishment, and to adequately deter criminal conduct.

However, as § 3553(a) makes clear, the Court must also consider factors unique to a particular defendant. For example, the Court must consider the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). Likewise, the Court must consider what punishment is sufficient to protect the public from further crimes of the particular defendant present before it. 18 U.S.C. § 3553(a)(2)(C). While the Court is mindful of its obligation to attempt to avoid "unwarranted" sentence disparities among defendants with similar records and found guilty of similar conduct, courts may—and in fact should— attempt to distinguish between defendants with different records or who have engaged in different conduct. *See* 18 U.S.C. § 3553(a)(6); *see also Gall,* 128 S.Ct. at 600 (stating that "it is perfectly clear that the District Judge . . . also considered the need to avoid unwarranted similarities among [defendants] who were not similarly situated").

The Government urges the Court to give only limited consideration to the factors unique to Defendant. Instead, they argue that the Court should give substantial deference to the relevant sentencing guidelines, arguing that they reflect the will of the people, as expressed through Congress. Specifically, the Government argues that these sentencing guidelines deserve greater deference than those based upon the Sentencing Commission's independent empirical findings. The Court disagrees. In fact, the Court believes they deserve less.

■ At the urging of Congress, the Sentencing Commission has amended the guidelines under § 2G2.2 on several occasions over the past two decades, recommending more severe penalties.[4] As far as this Court can tell, these modifications do not appear to be based on any sort of empirical data, and the Court has been unable to locate any particular rationale for them beyond the general revulsion that is associated with child exploitation-related offenses. *See* Skye Phillips, *Protect Downward Departures: Congress and Executive's Intrusion into Judicial Independence,* 12 J.L. & Pol'y 947, 967–84 (2004) (discussing the history of the guideline modifications made in the PROTECT Act and the fact that the changes were made without notifying or consulting the Sentencing Commission); *see also United*

---

4. *See, e.g.,* Amendment 372, U.S.S.G. App. C (1991) (responding to the Treasury, Postal Service and General Government Appropriations Act, Pub. L. No. 102–141, § 632, 105 Stat. 834 (1991)); Amendment 537, U.S.S.G. App. C (1996) (responding to the Sex Crimes Against Children Prevention Act of 1995, Pub. L. No. 104–71, §§ 2–4, 6, 109 Stat. 774 (1995)); Amendment 592, U.S.S.G. App. C. (2000) (responding to the Protection of Children From Sexual Predators Act of 1998, Pub. L. No. 105–314, §§ 506–507, 112 Stat. 2974 (1998)); and Amendments 649, U.S.S.G. App. C. (2003) and 664, U.S.S.G.App. C (2004)

(responding to the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today (PROTECT) Act of 2003, Pub. L. No. 108 P.L. 21, § 401, 117 Stat. 650 (2003)).

For a thoughtful commentary on the progression of the sentencing guidelines for child pornography offenses, *see* Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines,* July 3, 2008, *available at* http://mow.fd.org/3% 20July% 202008 % 20Edit.pdf (unpublished Comment, last visited Dec. 3, 2008).

*States v. Detwiler*, 338 F.Supp.2d 1166, 1170–71 (D.Or.2004) (discussing the Feeney Amendment to the PROTECT Act). Thus, because the guidelines at issue in this case do not reflect the unique institutional strengths of the Sentencing Commission in that they are not based on study, empirical research, and data, this Court, as it did in *United States v. Shipley*, "affords them less deference than it would to empirically-grounded guidelines." 560 F.Supp.2d 739, 745–46 (S.D.Iowa 2008); *see also Kimbrough*, 128 S.Ct. at 574 (noting that guideline ranges created when the Commission departed from past practices are a less reliable appraisal of a fair sentence).

■ Congress has created a fifteen-year window, between the statutory minimum (5 years) and maximum (20 years) sentences, within which this Court can penalize a convicted child pornographer. *See* 18 U.S.C. §§ 2252(a)(2), (b)(1). However, on account of Congress' tinkering with the guidelines, the Commission now recommends that nearly all defendants be incarcerated near the twenty-year statutory maximum. Thus, strict adherence to the sentencing guidelines effective at the time of Defendant's arrest, and even more so to those effective today, would make it difficult for the Court to consider the individualized factors that § 3553(a) requires. Stated differently, the Court would struggle to differentiate between the punishment appropriate for the most and the least egregious acts of child pornographers. As this Court noted in *Shipley*, the Court must consider the need to avoid unwarranted similarities in the punishment handed down to differently situated defendants. 560 F.Supp.2d at 745–46. The statute provides a broad range of punishments for the crime Defendant committed. If Congress does not want the courts to sentence individual defendants throughout that range based on the facts and circumstances of each case, then Congress should

amend the sentencing statute, rather than manipulate the advisory guidelines, thereby blunting the effectiveness and reliability of the work of the Sentencing Commission. While the Court has consulted the advice of the guidelines, the Court finds this advice is less reliable in the present case than in others where the guidelines are based on study and empirical data.

Indeed, the Court is charged with establishing a punishment that is sufficient, but not greater than necessary, for *this* defendant, and the Court cannot give too much weight to the sentencing guidelines, given their lack of empirical support. In consideration of Defendant, as an individual, the Court carefully evaluates Defendant's past history and characteristics and the need to protect the public in light of these characteristics. The Court views Defendant's behavior during the three-year period between the seizure of his computer and his indictment as a good indication of what society can expect from him after he completes his sentence. The Defendant is a 36 year old man who, when faced with the prospect of a lengthy jail sentence after the FBI search, chose to complete his medical degree and one year of his residency. Since that time, Defendant also sought treatment to regulate his mental health conditions. His wife, in a letter to the Court, asserts that they sought counseling, both as individuals and as a couple, and that Defendant adjusted his medications. Both Defendant and his wife attribute a noticeable improvement in his mental health to these treatment changes.

Also since 2004, Defendant's wife gave birth to their son. She describes Defendant as a "wonderful father [who] plays an important part in [their] son's life." As noted earlier, Defendant's son suffers from a congenital birth defect that requires extra developmental intervention. Defendant's wife notes that she would not have

had a child with Defendant after his arrest had she felt he was a threat to children. Likewise, Rogers opined that Defendant does not possess risk factors that would indicate that Defendant is a likely threat to children despite the fact he derived some sexual pleasure from some of the photographs. In light of Defendant's interaction with his family and with society during the three-year period and the absence of any criminal history at all, the Court believes that Defendant is not likely to harm the public through future crimes.[5]

Given the Defendant's aforementioned attributes, the Court believes that a sentence well below the guideline range is warranted. Defendant is unlike other many other child pornography collectors in that Defendant is not a pedophile. He is not an appreciable risk to the community, and he is getting treatment for the underlying medical condition that spurred this deviant behavior. Moreover, Defendant will suffer the lifelong social stigma of being a sex offender. He will be required to register as a sex offender, and he will face the accompanying severe restrictions on his liberty. *See United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir.2008) (noting it was appropriate for the district court to consider, under § 3553(a), the "lasting effects of being required to register as a sex offender") (citing *United States v. Anderson*, 533 F.3d 623, 633–34 (8th Cir. 2008)). However, a mandatory minimum sentence would be inappropriate in this case given the number and nature of the underlying photographs. Consequently, the Court believes a sentence of 84 months, seven years, incarceration, with ten years supervised release is sufficient, but not greater than necessary.[6] The Gov-

ernment's offer of the Butner Study does not change the Court's decision for the reasons discussed below.

C. *Consideration of the Butner Study*

■ The Government offers the Butner Study to demonstrate that Defendant is a threat to the public. However, the Government also offers the Study to show that "defendant is statistically more likely than not to have actually committed [a past] act of ["hands-on"] child abuse." Pl.'s Sentencing Mem. at 22. The inference that the Government asks the Court to draw is distasteful and prohibited by law. Uncharged criminal conduct may generally only be considered in sentencing if proved by a preponderance of the evidence. *See United States v. Howe*, 538 F.3d 842, 855 (8th Cir.2008); *see also United States v. Tyndall*, 521 F.3d 877, 882 (8th Cir.2008). Moreover, the Government bears the burden of proof. *United States v. Azure*, 536 F.3d 922, 933 (8th Cir.2008). The Butner Study, even if credible, falls far short of this standard because it fails to demonstrate whether Defendant has, personally, previously assaulted a child sexually. At most, the Study reveals that a majority of other individuals with a similar criminal history committed crimes against children, but the Court cannot see how evidence of those individuals' crimes establishes by a preponderance of the evidence that Defendant committed a prior sexual crime. This conclusion is only bolstered by the fact that the Government failed to present any physical evidence that Defendant sexually assaulted anyone, let alone a child. The Government produced no witnesses, no victims, no forensic evidence, no confession, and no other sign that any previous im-

---

5. Indeed, the Government's unexplained failure to prosecute this case for three years, despite having all the evidence and a confession, is likely an indication of the Government's true assessment of Defendant's dangerousness.

6. The conditions of Defendant's supervised release will be articulated in the Judgment and Commitment Order accompanying this opinion.

proper sexual activity occurred. Indeed, the Government agreed with the PSR's calculation of Defendant's criminal history, which does *not* include any references to prior sexual crimes. Therefore, this Court will not accept the implicit invitation to use the Butner Study to hold Defendant accountable for a phantom crime unsupported by any evidence.

The Court also rejects the Government's attempt to use the Butner Study to demonstrate that Defendant is a danger to the community. The Government argues that Defendant is dangerous because the Study indicates other individuals charged with similar crimes have committed "hands-on" sexual abuse of children.[7] The Court rejects this proposition because the Butner Study is not credible. The Butner Study's sample population consisted of incarcerated individuals participating in a sexual offender treatment program at a federal correctional institution. Tr. at 29. As Rogers testified, the program is "highly coercive." *Id.* Unless offenders continue to admit to further sexual crimes, whether or not they actually committed those crimes, the offenders are discharged from the program. *Id.* Consequently, the subjects in this Study had an incentive to lie, despite the fact that participation in the program would not shorten their sentences. Rogers testified that the Study's "whole approach" is rejected by the treatment and scientific community. *Id.* Complicating this bias is the fact that the But-

ner Study did not report on the nearly 23% (46/201) of individuals in the treatment program who left due to "voluntary withdrawal, expulsion, or death." Butner Study at 10. As a result, the offender population and the Study's results were almost certainly skewed. Tr. at 30.

The Butner Study also suffers from additional methodological flaws. First, the subjects of the Study were not randomly selected from those who only collect child pornography, which indicates that even setting aside the incentive to lie, the sample population may not be representative of the larger population that collects child pornography. *Id.* at 33. Second, the Study employed an unpublished questionnaire. *Id.* at 37. This prevents other independent researchers from verifying whether the questionnaire is reliable and capable of producing results that are accurate and meaningful. *Id.* at 38. Third, the Study relies, in part, on the results from polygraph examinations, which is highly problematic given the unreliability of such tests, especially since "no standard for training polygraph experts" exists. *Id.* at 34. Fourth, the Study is not peer reviewed, which is the norm in science.[8] *Id.* at 30. According to Rogers, the peer review process would likely be "pretty uncomfortable" for the researchers because the data and statistics in the Study do not fit the researchers' conclusions. *Id.* Finally, the Study also appears to suffer from

---

7. The Court will note that the Butner Study is not exactly on point because it never delves into the risk of recidivism of sexual offenders. The Study merely investigates whether current sexual offenders have committed other, undisclosed sexual crimes. The Court will, however, accept the proposition that those who have physically harmed children are more dangerous to the community than individuals who only collect child pornography. Thus, the Study is indirectly relevant in determining the dangerousness of an individual like Defendant.

8. Peer review is also a key factor that the courts consider when deciding whether to allow scientific testimony into evidence under Federal Rule of Evidence 702. *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 593–94, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Although the Federal Rules of Evidence do not technically apply at sentencing, the Court does note that this Study would likely fail to meet the *Daubert* standard.

flaws relating to its control group and independent variable, or lack thereof. *Id.* at 31–34.

Instead of producing an expert to explain the apparent weaknesses in the Butner Study, the Government preferred to attack Rogers' critique. The Government first brought out the fact that Rogers had not seen the questionnaire and had no knowledge of the 155 inmates, arguing that Rogers had "no factual basis to dispute" the methodology or conclusions of the Study. *Id.* at 38–41, 51. The Government also tacitly encouraged the Court to look beyond any flaws in the Study because it was "exploratory," a "first step" that the authors believe to be the "tip of the iceberg." *Id.* at 51. The Court, however, finds neither of these argument persuasive. The Court agrees with Rogers' testimony that it was the duty of the researchers to be transparent and to fully incorporate their methodology and conclusions into the Study so that other independent researchers could verify the reliability of the Study. *Id.* at 42. By failing to disclose this information, the researchers failed to meet the "standard in scientific research" and failed to produce a study upon which the Court can rely. *Id.* The Court will not accept "science" conducted in secret. Second, the Court will not look past the shortcomings of this Study merely because the Study is unique or new. Indeed, the fact that the Study is revolutionary in nature gives this Court great pause for concern, especially since it produced the sensational result that somewhere between 85% and 98% of child pornography collectors have personally molested children.[9]

In sum, the Court will not consider the results of the Butner Study unless and until either the Government or the researchers provide transparency for its methodology and a compelling explanation for its many apparent failings. While the Court is loathe to simply agree with a mostly unchallenged expert,[10] the Court can find no error in Rogers' conclusion that the Butner Study "isn't scientifically vetted, [ ] doesn't meet scientific standards for research, and [ ] is based upon, frankly, an incoherent design for a study." *Id.* at 33.

## V. CONCLUSION

After considering all the factors in § 3553(a), the Court believes a sentence of 84 months (seven years) imprisonment, followed by ten years of supervised release with stringent conditions, is a sentence that is sufficient, but not greater than necessary, to effectuate the goals of sentencing in this case. The Defendant must pay the required $100 to the crime victims' fund, but need not pay an additional fine based on this Court's finding that Defendant is unable to pay.

IT IS SO ORDERED.

9. The Court finds these results highly questionable given the extraordinarily high percentages, as well as the fact that the researchers saw a 2,369% increase "in the number of contact sexual offenses acknowledged by the treatment participants" during the course of the Study. Butner Study at 17. These astronomical figures lead the Court to question whether this unvetted prison Study, conducted by the former chief of the federal sexual offender treatment program and distributed by the Department of Justice to prosecutors, is, in actuality, a product of the tremendous "political pressure applied" to researchers in this research field. Tr. at 7, 45.

10. The Court believes that the adversarial process is the best means for ferreting out the truth, and without another expert to challenge Rogers, any weaknesses in his testimony may not be revealed. Thus, the Court hesitates to simply accept his testimony.