HARDIMAN, Circuit Judge,
dissenting in part.
I join my colleagues in recognizing the diligence and seriousness of purpose shown by the District Court in sentencing David Grober. I join them also in recognizing that the District Court “erred in some respects.” Maj. Op. at 601. Because I am convinced that the procedural errors committed by the District Court are material, however, I must respectfully dissent.[1]
I.
After pleading guilty to six federal crimes, Grober’s statutory imprisonment range was 60-240 months. His base offense level was 22 and his criminal history category was I, yielding an initial imprisonment range of 41-51 months under the United States Sentencing Guidelines (USSG). Because he qualified for five sentencing enhancements pursuant to USSG § 2G2.2, however, Grober’s base offense level rose to 40. After a two-level downward adjustment for acceptance of responsibility, Grober’s final Guidelines range was 235-293 months imprisonment, which was capped at 240 months by virtue of the statutory maximum.
Despite the fact that Grober’s Guidelines range was aligned with the statutory maximum, he was sentenced to the statutory minimum of 60 months imprisonment. A variance of this magnitude requires us to “consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.” United States v. Merced, 603 F.3d 203, 216 (3d Cir.2010) (quoting Gall v. United States, 552 U.S. 38, 50, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007)).
“The freedom to vary from the ... Guidelines ... is not free. Its price is a reasoned, coherent, and sufficiently compelling explanation of the basis for the *612 court’s disagreement.” Merced, 603 F.3d at 219-20 (quoting United States v. Lychock, 578 F.3d 214, 220 (3d Cir.2009)). “A ‘sufficiently compelling’ explanation is one that is grounded in the 3553(a) factors.” Id. at 221. Because the Sentencing Commission is charged with effectuating the objectives of § 3553(a), the District Court, in categorically rejecting § 2G2.2, “must explain why its policy judgment would serve the § 3553(a) sentencing goals better than the Sentencing Commission’s judgments. In doing so, [the court] should take into account all of the sentencing factors, not just one or two of them in isolation.” Id.
Since the Supreme Court’s decision in United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), district judges have wrestled with the scope of their sentencing discretion. Although statutory ranges established by Congress still circumscribe this discretion, in many cases (like this one) those ranges are so broad that the potential for unwarranted sentencing disparities looms large. Accordingly, Booker and its progeny reflect the Supreme Court’s ongoing support for the Guidelines as a critical starting point and frame of reference as judges discharge their most solemn duty: imposing criminal sentences. See, e.g., Kimbrough v. United States, 552 U.S. 85, 108, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007) (“While rendering the Sentencing Guidelines advisory, we have nevertheless preserved a key role for the Sentencing Commission.”); Gall, 552 U.S. at 49, 128 S.Ct. 586 (“As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.”); cf. Booker, 543 U.S. at 311, 125 S.Ct. 738 (Scalia, J., dissenting) (“The worst feature of the scheme is that no one knows — and perhaps no one is meant to know — how advisory Guidelines and ‘unreasonableness’ review will function in practice.”).
In view of the Supreme Court’s continuing support for the Guidelines, we must ensure that district courts do not evaluate the sentencing factors of 18 U.S.C. § 3553(a) in a way that renders the Guidelines irrelevant. At least two reasons animate this imperative. First, fidelity to Booker and its progeny demands it. Second, should the courts of appeals fail to police wildly disparate sentences, I fear that Congress will respond to the evisceration of the Guidelines by prescribing statutory sentencing ranges that will, in their detail, rival the 282 laws of the Code of Hammurabi about which the District Court in this case expressed such consternation.
II.
In Kimbrough v. United States, 552 U.S. 85, 91, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007), the Supreme Court held USSG § 2D1.1, like all other Guidelines, to be advisory. In light of the uncertainty surrounding the authority possessed by district courts to alter or disregard the 100 to 1 crack/powder ratio, the Court in Spears v. United States, — U.S. -, 129 S.Ct. 840, 172 L.Ed.2d 596 (2009), “clarified] that district courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines.” Id. at 844. Apparently in light of Spears, in this appeal the Government has conceded that district courts may categorically reject USSG § 2G2.2.[2] Nevertheless, the Dis *613 trict Court committed several missteps on its way toward categorically rejecting § 2G2.2, and its wholesale rejection of that Guideline rendered Grober’s sentence procedurally unreasonable.
The Majority candidly acknowledges the District Court’s errors in: (1) faulting the Government for not presenting a live witness at sentencing to defend § 2G2.2; (2) taking testimony from Professor Douglas Berman who, though an authority on sentencing law and policy, conceded a lack of expertise with respect to § 2G2.2; (3) describing Grober as a “downloading defendant”; and (4) comparing Grober to a dissimilar defendant who was sentenced pursuant to a plea agreement. Maj. Op. at 610-11. After briefly explaining away each of these errors, the Majority concludes “that the District Court did not commit any significant procedural error requiring remand.” Id. at 613.
If the only error committed by the District Court had been to hear testimony from Professor Berman, I would agree with my colleagues. If the District Court had committed only the first, or the third, or the fourth error noted above, we would be presented with a closer case. But when the foregoing errors are considered in the aggregate, as they must be, the District Court committed reversible error.
A.
I begin with the fourth error cited by the Majority because I find it the most egregious. In support of its decision to disregard § 2G2.2, the District Court adverted to “its own experience about the problematic nature of charging discretion and plea arrangements” and likened Grober to an unnamed “earlier defendant” who had pleaded guilty to one count of possession pursuant to a plea agreement. Grober, 595 F.Supp.2d 382, 399 (D.N.J. 2008).
Although much remains unknown about this “earlier defendant,” we do know that his crime of conviction was materially different than Grober’s. The “earlier defendant” pleaded guilty to one count of possession. Grober, on the other hand, pleaded guilty to six counts (one for possession, three for receipt or distribution, and two for transportation) after rejecting the Government’s first two plea offers, which included the dismissal of the receipt and distribution charges. By contrasting the Guidelines range Grober faced with the range faced by the “earlier defendant,” the District Court concluded that applying the enhancements recommended by the Probation Office and advocated by the Government would result in sentencing disparities.
But the disparities caused by, to use the District Court’s words, “charging discretion and plea arrangements,” Grober, 595 F.Supp.2d at 399, are endemic to all Guidelines and have nothing to do with § 2G2.2 in particular.[3] By rebuking the *614 Government for obtaining a superseding indictment after Grober twice rejected the Government’s offers, the District Court launched a frontal assault on the plea bargaining system. Irrespective of the subject matter — whether it be child pornography, drugs, securities fraud, or countless other federal crimes — it is unremarkable that the Government tries to cajole the guilty to fess up promptly. And those who do so are rewarded with fewer or less significant charges, thereby earning them more lenient sentences than those who are convicted after a trial or an eleventh-hour plea. This is the essence of an imperfect, but long-tenured system that has been endorsed by the Supreme Court. See, e.g., Santobello v. New York, 404 U.S. 257, 260, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) (finding that courts have long considered plea bargaining to be “an essential component of the administration of justice,” and if “properly administered, [the procedure should] be encouraged”); Brady v. United States, 397 U.S. 742, 752, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) (describing the “mutuality of advantage” for both the State and the defendant to plea bargain: “For a defendant who sees slight possibility of acquittal, the advantages of pleading guilty and limiting the probable penalty are obvious — his exposure is reduced, the correctional processes can begin immediately, and the practical burdens of a trial are eliminated. For the State there are also advantages — the more promptly imposed punishment after an admission of guilt may more effectively attain the objectives of punishment; and with the avoidance of trial, scarce judicial and prosecutorial resources are conserved for those cases in which there is a substantial issue of the defendant’s guilt or in which there is substantial doubt that the State can sustain its burden of proof.”); see also George Fisher, Plea Bargaining’s Triumph: A History of Plea Bargaining in America (Stanford University Press 2003) (finding that plea bargains were commonplace in criminal trials in the United States as early as 1800); Milton Heumann, Plea Bargaining: The Experiences of Prosecutors, Judges, and Defense Attorneys (University of Chicago Press 1978) (describing strong support for plea bargaining among prosecutors, defense attorneys, and judges familiar with the system).
In sum, by comparing Grober to the “earlier defendant” who accepted a plea agreement, the District Court impermissibly penalized the Government for its role in the plea bargaining system. This was reversible error.
B.
In addition to the District Court’s rejection of the plea bargaining system, a significant evidentiary error tainted the sentencing hearing. The District Court challenged the Government to proffer a witness from the Sentencing Commission to justify § 2G2.2 and to counter testimony from Professor Berman regarding federal defender Troy Stabenow’s paper: Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines (hereinafter Stabenow). In the words of the District Court: “[I]insofar as the government might have established a dialogue between Professor Berman and the Commission on the Stabenow research or any other issue Professor Berman testified about, it took a *615 pass. So did the Commission.... Hence, despite the Court’s invitation and many opportunities, the testimony of Professor Berman is unrebutted by live testimony.” Grober, 595 F.Supp.2d at 391. As the Majority correctly noted: “Even aside from the government’s argument that this type of inquiry is legally impermissible, as a practical matter, it is unworkable.” Maj. Op. at 609.
The Government was right to decline the Court’s unorthodox invitation. It would have been no more proper for the Government to have proffered a member of the Sentencing Commission to opine regarding the history and purpose of § 2G2.2 than it would have been to proffer a Senator or Representative to testify regarding the legislative history of the child pornography laws. The Guideline promulgation process is not subject to “discovery.” See, e.g., United States v. LeRoy, 984 F.2d 1095, 1098 (10th Cir.1993). The Commission so advised the District Court in a letter attached as Appendix A to the Court’s opinion, which stated:
The Act provides, in 18 U.S.C. § 3553(b)(1), that in determining whether a circumstance was adequately taken into consideration by the Commission in formulating the guidelines, “the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission.” The legislative history of this provision makes clear that Congress limited the court’s consideration in this regard to preclude the possibility of legal process directed at the Commission, individual commissioners, or staff in an effort to look beyond the sources specified. See 133 Cong. Rec. 31,946 (1987) (statement of Rep. Conyers) (“The purpose of the amendment is to ensure that members of the Sentencing Commission, as well as its records, are not subject to subpoena at the sentencing of a convicted defendant.”); 133 Cong. Rec. 33,110 (1987) (statement of Sen. Thurmond) (“There was some concern that failure to specifically designate the materials that may be used ... could result in members of the Commission, or their notes or other internal work products, being subpoenaed. This was never intended by Congress.”).
Grober, 595 F.Supp.2d at 412, app. A.
While the Government did not present live testimony to rebut Berman or Stabenow, it did argue in its briefs that the reasons supporting the creation and evolution of § 2G2.2 were discernible. Although the Majority concludes that the District Court “clearly” relied upon the briefs in this regard, Maj. Op. at 610-11,1 find no record support for this conclusion. Accordingly, I do not share the Majority’s view that the District Court truly evaluated and rejected the Government’s arguments after due consideration. Indeed, the District Court’s pejorative characterization that both the Government and the Commission “took a pass” suggests that the District Court placed nothing on the Government’s side of the scale. And something outweighs nothing every day of the week.
In its search for something, the District Court relied extensively on Stabenow, which criticizes § 2G2.2 on several levels. Regarding the District Court’s reliance on Stabenow, the Majority states: “It is unnecessary for purposes of this Opinion to parse the paper and determine if the government is correct as to the inaccuracies to which it points.” Maj. Op. at 603 n. 7. I disagree. Because Stabenow was foundational to the District Court’s decision to disregard § 2G2.2, the Majority should be obliged to engage the Government’s arguments to ensure that Stabenow is, in fact, *616 “sufficiently compelling” to justify the Court’s divergence from the Guideline.
After the District Court knocked down its straw man — ie., the Government’s failure to provide a testimonial defense of § 2G2.2 — the only “evidence” that remained was Stabenow, which offered an advocate’s blueprint for rejecting § 2G2.2 and the “unrebutted” testimony of Professor Berman. In my view, this procedural error was sufficient to warrant vacatur.
C.
Next, I turn to the District Court’s repeated mischaracterization of Grober’s crime as a typical “downloading” offense. In declining to apply any of the detailed enhancements found in § 2G2.2, the Court was “convinced that for a typical downloading case, which this one assuredly is, the applicable guideline ... cannot be given deference.” Grober, 595 F.Supp.2d at 402. As the Majority notes, however, “this is more than a ‘typical downloading case.’ ” Maj. Op. at 598 n. 1. Grober admitted sending two e-mails containing eighteen images. This conduct formed the basis for Counts One and Three at which Grober pleaded guilty to transportation of child pornography, in violation of 18 U.S.C. § 2252A(a)(l). These two offenses — as distinguished from the three counts of receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2)(A) and one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B), which can properly be deemed “typical downloading” offenses — are properly classified as transportation counts.[4]
Congress considers the transportation of child pornography a particularly egregious crime, and in recent years has expressed its concern that “the development of the Internet and the digital image ... ha[s] permitted child pornographers to disseminate their product exponentially, not only across America, but around the world, with a few simple strokes of a keyboard.” 151 Cong. Rec. 4236 (Feb. 24, 2003); see also 151 Cong. Rec. 20221 (2005) (finding that “a substantial interstate market in child pornography exists, including not only a multimillion dollar industry, but also a nationwide network of individuals ... [who] distribute child pornography with the expectation of receiving other child pornography in return.”). As the District Court recognized, Congress imposed a mandatory minimum for transportation offenses, based on its finding that “the exchanging through trading images contributes to the growth of child pornography and harms increasing numbers of children.” Grober, 595 F.Supp.2d at 404. Given the Court’s acknowledgment of the policy reasons supporting Congress’s distinction between distributors and possessors, its repeated characterization of Grober as a “typical downloader” whose crimes were those of “consumption” was inexplicably dismissive of Congress’s substantial concerns.
The District Court’s mischaracterization of this case as a “typical downloading case” is also troubling given the Sentencing Commission’s historically dissimilar treatment of possession and distribution of *617 fenses.[5] The distinction between “simple receipt” and distribution offenses can be traced to the Commission’s first set of Guidelines, promulgated in 1987, which included a five-level enhancement for distribution for monetary gain. USSC, The History of the Child Pornography Guidelines, 11 (Oct. 2009) [.History of the Guidelines ].[6] After Congress criminalized possession of child pornography in 1991 and the Commission in response thereto proposed USSG § 2G2.4, which grouped together receipt and possession offenses, the Chair of the Sentencing Commission assured Congress that “defendants who peddle child pornography will be sentenced as traffickers even if they successfully negotiate a plea to the lesser offense of simple possession of child pornography.” Stabenow at 7 (citing 137 Cong. Rec. H6736-02, Appendix B). The Chairman’s letter stated that this difference in the severity of the crimes “parallels the manner in which illegal drugs (or firearms) receipt and possession are treated similarly under the guidelines, while drug (or firearms) distribution or trafficking are treated more severely.”[7] Id.
The Commission’s inclusion of noncommercial bartering of child pornography in its 2000 definition of distribution followed a series of studies confirming the prevalence of bartering, and its harm to children. In its 1990 Report to Congress, the Commission noted that all the trafficking offenses prosecuted up to that date had involved defendants who traded images for pleasure, rather than for pecuniary gain. USSC, Revised Report of the Working Group on Child Pornography and Obscenity Offenses and Hate Crime, 17 (1990); see also USSC, Sex Offenses Against Children: Findings and Recommendations Regarding Federal Penalties, 10 (1996) (“Many cases sentenced under this guideline involve trading clubs or other barter types of exchanges.”). The Commission’s proposed amendment was published in 1999 and included a five-level enhancement for the distribution of child pornography in exchange for a “thing of value.”[8] It received only one substantive public comment: The Federal Public and Community Defenders recognized that “child pornographic material is a ‘thing of value’ and if received in a bartered exchange for other child pornographic material, an enhancement should apply.” History of the Guidelines at 34.
*618 Thus, the Commission’s harsher treatment of trafficking, and in particular non-pecuniary bartering such as the trading at issue in this case, was the product of careful study and public commentary, activities well within the “exercise of [the Commission’s] institutional role.” Grober, 595 F.Supp.2d at 393 (citing United States v. Shipley, 560 F.Supp.2d 739, 745-46 (S.D.Iowa 2008)). By failing to characterize Grober properly as a distributor of child pornography, the District Court gave little, if any, credence to the institutional expertise of the Commission in developing Guidelines that treat distributors more severely than mere possessors or receivers of child pornography.
Moreover, the Commission’s adoption of higher penalties for distribution offenses should be accorded no less deference simply because of the ease with which files can now be traded via e-mail or file sharing networks. Just as we do not treat less severely the use of a firearm during the commission of a robbery or the targeting of an elderly victim, both of which facilitate the crime, so too should we not turn a blind eye to the devastating effect of electronic distribution on the lives of abused children merely because the distributor can inflict his injury by transferring hundreds of files with the stroke of a key. See United States v. Cunningham, 680 F.Supp.2d 844, 853 (N.D.Ohio 2010). In fact, the harsher penalties for online bartering were adopted in part to target at-home traders who contribute considerably to the electronic market for child pornography, believing there to be little chance of detection from law enforcement.
In both its extensive oral decision and its written opinion, the District Court repeatedly referred to this as a “downloading case.” Although the District Court referred intermittently to Grober’s convictions for transporting child pornography, the record belies any appreciation for the fact that these offenses are qualitatively different and more severe than mere possession. See Grober, 595 F.Supp.2d at 382 (“The crime of conviction in this case is David Grober’s downloading of child pornography from the internet.”); id. at 391 (“The Court denied the government’s motion to exclude and later to strike Professor Berman’s testimony, because the Court believes it is vital to gain some perspective on the operation of the sentencing guidelines in these downloading eases.”); id. at 393 (“The Stabenow chart is a one-page devastating commentary on guidelines sentencing in downloading cases.”); id. (“The Court agrees with the reasoning of Judge Pratt and Judge Adelman that § 2G2.2 leads to a sentence that is too severe in a downloading case.”); id. at 391 (“[A]s the recent cases show, judges are varying from the guidelines in typical downloading cases when they measure the guidelines against the § 3553(a) factors.”); id. at 402 (“The Court arrives at this point in the sentencing analysis convinced that for a typical downloading case, which this one assuredly is, the applicable guideline, § 2G2.2, cannot be given deference and produces an unreasonable sentencing range even before considering the sentencing factors in § 3553(a).”); id. (“[T]he Court finds that David Grober’s case is squarely within the heartland of downloading cases.”); id. at 410 (“As indicated above, the government’s publication ‘Federal Prosecution of Child Sex Exploitation Offenders, 2006’ states that as of December 2007, the average sentence for the downloading defendant is 63 months. From this same report comes the information that David Grober is a very typical downloading defendant.”).
The foregoing quotations demonstrate that the District Court’s references to “downloading” were not merely a “form a shorthand,” Maj. Op. at 599-600 fn.2. *619 Rather, they evidence a fundamental misapprehension of Grober’s crimes. This constitutes reversible error.[9]
D.
Finally, the District Court’s wholesale rejection of § 2G2.2 throws the wheat out with the chaff. I have no quarrel with the concerns expressed by the District Court regarding the draconian nature of Grober’s Guidelines range and the fact' that the enhancements for use of a computer (USSG § 2G2.2(b)(6)) and pre-pubescent minors (USSG § 2G2.2(b)(2)) would put Grober into a category with 95% of those convicted of child pornography offenses. But the District Court was wrong to ignore: (1) the fact that Grober’s collection contained material portraying sadistic and masochistic conduct (USSG § 2G2.2(b)(4)); (2) that Grober distributed child pornography for the receipt, or expectation of receipt, of a thing of value (USSG § 2G2.2(b)(3)(B)); and (3) that Grober possessed well over 600 images (USSG § 2G2.2(b)(7)(D)). While the District Court was free to evaluate these facts pursuant to 18 U.S.C. § 3553(a), it was not permitted to disregard them entirely.
At least three of our sister courts of appeals have noted the trend towards granting downward variances in cases involving § 2G2.2. See, e.g., U.S. v. Morace, 594 F.3d 340, 346-47 (4th Cir.2010); U.S. v. Stall, 581 F.3d 276, 284 n. 2 (6th Cir.2009); U.S. v. Huffstatler, 571 F.3d 620, 622-23 (7th Cir.2009). Grober’s sentence is problematic, however, because instead of assessing all of the relevant facts of Grober’s case as part of its § 3553(a) analysis — including those facts that happen to be embodied in § 2G2.2 enhancements— the District Court rejected § 2G2.2 in toto. Having unmoored itself entirely from this Guideline, the District Court begins (and ends) its evaluation of the § 3553(a) factors by fixating on the five-year statutory minimum. Consequently, the District Court’s variance was both inadequately justified and, at least in part, based on clearly erroneous facts, to wit: Grober was a “typical downloader,” his collection was not “egregiously large,” and Agent Chase was not qualified “to distinguish between ‘bad’ child pornography and ‘really bad’ child pornography,” Grober, 595 F.Supp.2d at 401. See Gall v. United States, 552 U.S. 38, 51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007).
A survey of other district courts that have evaluated § 2G2.2 demonstrates the nature of the District Court’s error here. While it is true that district courts have varied downward from the Guidelines range — and sometimes substantially so— they still considered case-specific facts underlying § 2G2.2 enhancements; they did not entirely disregard those facts along with the Guideline. See, e.g., United States v. Beiermann, 599 F.Supp.2d 1087, 1107 (N.D.Iowa 2009) (“[A] reasoned alternative to the flawed guideline is for the sentencing judge to begin with the base offense level, which reflects the mandatory minimum statutory sentence, U.S.S.G. § 2G2.2(a), and then to consider appropriately identified factors, such as those in § 2G2.2(b)(l), (3), (4), and (5), but to give those factors more appropriate weight in the determination of a particular defendant’s sentence. Such ‘cherry picking’ and reweighing of factors from the guideline is appropriate — indeed, totally consistent *620 with the exercise of my discretion to apply the 18 U.S.C. § 3553(a) factors.”); United States v. Jacob, 631 F.Supp.2d 1099, 1108 (N.D.Iowa 2009) (“While I reject the extent of the enhancements based on these considerations [of specific aggravating factors] in § 2G2.2 and § 2G2.1, I find that some enhancement of the defendant Jacob’s non-guideline sentence above the mandatory minimum is appropriate based on these considerations.”); cf. United States v. Bums, 2009 WL 3617448, *7-*8 (N.D.Ill.2009) (“Here, the court declines to disregard the Guidelines entirely and instead adapts them by beginning with the base offense level (as it reflects a statutory minimum) and then rejecting enhancements that the court determines exact punishment that is duplicative of the underlying offense, or do not otherwise effectively serve to distinguish less from more culpable conduct. On the other hand, the court will apply an enhancement or downward adjustment where it finds such an adjustment appropriate based on Burns’s relevant individual characteristics or other factors outlined in 18 U.S.C. § 3553(a).”).
Each of the aforementioned courts determined that certain § 2G2.2 factors — ■ e.g., the number of the images, the sadism or masochism depicted in the images, the defendant’s distributing activities — warranted a sentence above the statutory minimum. See Burns, 2009 WL 3617448 at *13, *16 (incorporating a five-point “pattern of ... exploitation” enhancement as basis for a 72-month sentence); Beiermann, 599 F.Supp.2d at 1107, 1117-18 (sentencing defendant to 90 months after “reweighing” and “cherry picking” Guidelines factors); Jacob, 631 F.Supp.2d at 1108 (reweighing the sadistic, masochistic, or violent content and the distribution factors as a basis for a 78-month sentence on transportation count); see also United States v. Cunningham, 680 F.Supp.2d 844, 853, 862 (N.D.Ohio 2010) (accepting § 2G2.2 and imposing a within-Guidelines range sentence of 121 months); United States v. McElheney, 630 F.Supp.2d 886, 904 (E.D.Tenn.2009) (imposing a 78-month sentence because based on the size and sadistic nature of the defendant’s collection and the prepubescent victims, “the Court cannot conclude he is among the least culpable of child pornography offenders”); United States v. Noe, 2009 WL 3836707, *7 (D.Neb.2009) (granting variance but imposing an 84 month sentence rather than statutory minimum); United States v. Johnson, 588 F.Supp.2d 997, 1005 (S.D.Iowa 2008) (considering the “number and nature of the underlying photographs” as basis for an 84-month sentence); United States v. Noxon, 2008 WL 4758583, *3 (D.Kan.2008) (considering, in part, the defendant’s distribution activities as basis for a 144-month sentence).
The two judges most heavily cited by the District Court followed the procedure I just outlined. Judge Adelman in United States v. Hanson considered the facts relevant to § 2G2.2 enhancements in arriving at a 72-month sentence for transportation and receipt of child pornography, stating: “In order to acknowledge some of the aggravating factors in this case, such as number and type of images, and to insure just punishment, I did not impose a sentence at the minimum, as defendant requested. The minimum should be reserved for the most mitigated of cases.” 561 F.Supp.2d 1004, 1012 (E.D.Wis.2008). Likewise, Judge Pratt in United States v. Shipley accounted for the “horrific nature of some of the images” as well as the defendant’s role as a distributor in “actively and consistently perpetuating the market for this material” as bases for a 90-month sentence for receipt of child pornography. 560 F.Supp.2d 739, 745-46 (S.D.Iowa 2008).
*621 The District Court’s wholesale rejection of all things related to § 2G2.2 — including even the legitimate concerns at the heart of each enhancement — is quite atypical. In cases like Grober’s, most courts that have imposed substantial downward variances have given some weight to those aggravating factors enunciated in § 2G2.2 as part of their § 3553(a) analyses. Regardless of the validity of the District Court’s general policy argument against § 2G2.2 enhancements as they fit within the Guidelines scheme, the Court in this case erred in its § 3553(a) analysis by minimizing and sidestepping significant facts about Grober’s crime, seemingly in protest of the draconian nature of § 2G2.2 as a whole. See Arrelucea, 581 F.3d at 151, 156 (noting that it is a “judicial function to sentence defendants based on the facts and circumstances of each case under the guidance of the § 3553(a) factors”).
The District Court’s nullification of § 2G2.2 influenced its curt discussion of the “nature and circumstances of the offense,” which comprises a mere three paragraphs, in contrast to its ten-paragraph discussion of the “history and characteristics of the defendant.” Grober, 595 F.Supp.2d at 404-408. Within the “nature and circumstances of the offense” discussion, the District Court brushes aside the size and content of Grober’s child pornography collection (over 1500 pictures and 200 videos) without any mention of Special Agent Chase’s testimony that this was the second largest collection out of 180 she had analyzed in her four-year career and that it included “more children ... involved in actual sexual activity, as opposed to posing, than appeared in other collections she analyzed.” Id. at 400, 404.[10] Even if the § 2G2.2 enhancements for 600 images, prepubescent children, and masochistic content apply in most cases and are therefore deserving of less weight than that which the Guidelines affix to them, surely the enormity and offensive nature of Grober’s collection is relevant enough to the “nature and circumstances of the offense” to deserve more than two dismissive sentences.[11] See id. at 404 (“The Court also is not convinced that Grober’s child pornography collection is egregiously large. He viewed a large amount of pornography over three years, he hoarded images, and he kept his images sloppily mixed in with other, legal files.”).
The District Court’s similarly dismissive treatment of Grober’s status as a distributor rather than a mere possessor has already been discussed at length, but warrants mention again here because this mischaracterization further tainted the Court’s § 3553(a) analysis of the nature of *622 the crime. See id. (“The nature and circumstances of his offense are at the core related to consumption.”).
In sum, even if it were proper to accept in its entirety the District Court’s policy disagreement with § 2G2.2, the extent to which it failed to account for significant facts that underlie § 2G2.2 enhancements reflects a deeply flawed analysis of the § 3553(a) factors. This “fail[ure] to adequately explain the chosen sentence” and reliance on a number of “clearly erroneous facts” requires vacatur and remand.
III.
As I noted at the outset, the District Court labored mightily to impose a just sentence upon David Grober. That effort was animated by a candid fear that Congress’s zeal to address the proliferation of child pornography has resulted in penalties grossly disproportionate to the culpability attendant to this type of crime. Even accepting that premise, it is still wrong for a sentencing court to: (1) categorically reject the validity of a Guideline by impugning generally the plea bargaining system; (2) punish a party for failing to present “evidence” it never should have presented in the first place; (3) mischaracterize a defendant’s crimes of conviction; and (4) use a categorical rejection of a Guideline as a proxy for ignoring some of the relevant § 3553(a) factors. Because each of these errors is manifest on this record, I would vacate Grober’s judgment of sentence and remand for a new sentencing hearing.

. I agree with my colleagues that the cross-appeal is unmeritorious. Therefore, this dissent is limited to the procedural reasonableness of Grober's sentence.

. The Government's concession here is consistent with Merced, where we observed that the notion that a Guideline driven by Congressional mandate is not subject to categorical rejection on policy grounds has fallen out of favor. Merced, 603 F.3d at 226. Although the Supreme Court endorsed such a categorical rejection of the crack cocaine Guidelines *613 (Spears), I am not convinced the Supreme Court would so hold in respect to the child pornography Guidelines. The storied history of the 100 to 1 crack/powder ratio is sui generis in my view. See United States v. Pugh, 515 F.3d 1179, 1201 (11th Cir.2008) (“The [child pornography] Guidelines involved in Pugh's case, however, do not exhibit the deficiencies the Supreme Court identified in Kimbrough.”). Rather than blithely assuming that the Supreme Court would permit the categorical rejection of all Guidelines as it did with USSG § 2D1.1, the better practice would be for district courts to consider each Guideline and enhancement on its peculiar merits (or demerits). This approach maintains the best of Booker (allowing district courts to do justice) without facilitating such wildly disparate sentences as to invite a Congressional "fix.”

. In United States v. Arrelucea-Zamudio, 581 F.3d 142 (3d Cir.2009), we recognized that *614 defendants who accept plea offers are often subject to lower sentences than those who do not. Id. at 157. Unlike the court in Arrelucea, which was concerned with reducing sentencing disparities among like defendants, here the District Court increased disparity by treating defendants convicted of different offenses similarly.

. Because Grober pleaded guilty to transportation offenses, the Majority’s reference to the 2009 survey of United States District Court Judges, which found that 70% of judges found the Guidelines for receipt and possession of child pornography too harsh, is inapt. The relevant statistic from this study (assuming its validity) is its finding that 30% of judges think the Guidelines punish distributors too severely. According to this study, the percentage of judges who find that the Guidelines punish the distribution of child pornography too severely is smaller than the percentage of judges who find the Guidelines too severe for: heroin, crack cocaine, methamphetamine, marijuana, and illegal entry offenses.

. In stark contrast to Kimbrough — where the Commission found that "the crack/powder sentencing disparity is generally unwarranted,” 552 U.S. at 97, 128 S.Ct. 558 — here, the Commission's finding that distribution is a more severe offense than possession mirrors Congressional findings.

. Notably, even Stabenow acknowledges that in these "first three years of the Guidelines regime [1987-1990], the provisions of § 2G2.2 were the result of study at the Commission, without obvious outside interference.” Stabenow at 3 (2008).

. Moreover, although a 1991 Congressional amendment, which Stabenow discusses in depth, directed the Commission to treat "simple receipt” as a crime to be sentenced under § 2G2.2, rather than § 2G2.4, the amendment made no change to the § 2G2.2 distribution enhancement. There is also no evidence that the Commission's eventual consolidation of § 2G2.2 and § 2G2.4 reflected any Commission opposition to the additional distribution penalty, but rather addressed the Commission’s concern that an "unwarranted disparity in sentences” existed for the similar offenses of "simple receipt” and "simple possession.” USSC, Sex Offenses Against Children: Findings and Recommendations Regarding Federal Penalties at 34 (1996).

.A "thing of value” is anything of valuable consideration, e.g., child pornographic material received in exchange for other child pornographic material bartered in consideration for the material received. See § 2G2.2, cmt. 1.

. Although the Majority correctly notes that "Grober is not in any sense a large-scale distributor,” Maj. Op. at 599-600 fn.2, it points to no evidence that Congress intended receipt and transportation crimes to apply only to large-scale enterprises. Rather, Congress intended the increased penalties associated with these crimes to apply to small-scale, home-based distributors such as Grober. 151 Cong. Rec. 20221 (2005).

. Like the District Court, the Majority minimizes Grober's transportation crimes by noting the small number of images he distributed. Conversely, they fail to consider the quantity and nature of the images in Grober's collection in their analyses of the nature and circumstances of his crime of possession.

. The Majority asserts that because "many of [§ 2G2.2’s] enhancements apply in almost all cases,” these enhancements are in fact built-in to the original offense. See Majority Op. at 607 (citing United States v. Dorvee, 604 F.3d 84 (2d Cir.2010) (noting that 91.2% of child pornography cases in 2009 involved images of prepubescent minors and 91.2% involved the use of a computer)). But the Majority does not justify the District Court’s disregard for those enhancements that apply only 73.4% and 63.1% of the time (offenses involving images of sadistic, masochistic, or otherwise violent conduct, and offenses involving over 600 images, respectively). Given that 26.6% of cases do not involve images of violence and 36.9% involve fewer than 600 images, the fact that Grober's collection was both greater than 600 and included violent images demonstrates beyond peradventure that his was not one of the "most mitigated of cases.” See United States v. Hanson, 561 F.Supp.2d at 1012.