# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1231

_____

|  |  |  |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | Appeal from the United States |
| | * | District Court for the District of |
| v. | * | South Dakota. |
| | * | |
| Tamara Azure a/k/a Tamara Wind, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: November 14, 2007
Filed: August 6, 2008

_____

Before MELLOY, BEAM, and SHEPHERD, Circuit Judges.

_____

MELLOY, Circuit Judge.

Tamara Wind[1] pled guilty to two counts of assault with a dangerous weapon. The district court sentenced Wind to a total term of 180 months' imprisonment—96 months on one count and 84 months on the other, with the terms to be served consecutively. On appeal, Wind alleges the district court erred in imposing its sentence. For the reasons stated below, we reverse the judgment of the district court and remand for resentencing.

_____

[1] The defendant indicated she preferred to be referred to as "Tamara Wind" during the proceedings below, and we will respect her preference.

I.      Background

        A.      The Charges

        In February 2005, a grand jury returned an indictment alleging Wind assaulted Rick Pickner (Count I) and Russell Obago[2] (Count II) with a dangerous weapon with intent to do bodily harm, in violation of 18 U.S.C. §§ 1153 and 113(a)(3). Events of October 23, 2001, gave rise to these charges. In October 2001, Pickner and Wind were living together and were romantically involved. Obago is Wind's nephew. On October 23, 2001, Obago agreed to give Wind a ride to obtain keys from Pickner. Once Wind found Pickner and attempted to recover the keys, a fight erupted. Pickner pushed Wind down and struck her with the key chain. Obago attempted to intervene between Wind and Pickner. During the melee, Wind grabbed a barbeque fork and attempted to strike Pickner. Wind's blow scratched Pickner, but struck Obago; the fork stuck in Obago's head, causing injuries that required four stitches.

        A grand jury returned a superseding indictment in July 2005, adding a charge of murder, a violation of 18 U.S.C. §§ 1153 and 1111, to the two counts included in the original indictment. Count III charged Wind with killing Pickner on June 5, 2004, by stabbing him in the chest with a knife. The events giving rise to this charge are hotly contested by the parties.

        B.      The Plea

        The parties reached a plea agreement resolving the charges included in the superseding indictment. Wind agreed to plead guilty to Counts I and II, and the government agreed to dismiss Count III at sentencing. The plea agreement advised

_____

        [2] The indictment identifies the victim as "Russell Obago." Other places in the record he is referred to as "Russell Obego." We will use the spelling from the charging document throughout this opinion.

Wind she faced a maximum potential term of imprisonment of ten years for each count of assault and noted she could be sentenced to consecutive terms of imprisonment. The agreement did not limit the parties' ability to make sentencing recommendations to the court. The plea agreement included an appeal waiver, which stated:

> WAIVER OF DEFENSES AND APPEAL RIGHTS: Defendant hereby waives any right to appeal any and all motions, defenses, probable cause determinations, and objections which she has asserted or could assert to this prosecution, and to the Court's entry of judgment against her and imposition of sentence, including sentence appeals under 18 U.S.C. § 3742. The parties agree that expressly excluded from this waiver of defenses and appeal rights is the defendant's right to appeal the sentence for a determination of "reasonableness" should the Court impose a sentence above the advisory guideline range established by the Court for the offense.

The agreement incorporated by reference a statement providing a factual basis for Wind's pleas to Counts I and II. There was no mention of the facts underlying Count III or the role the dismissed charge could play in Wind's sentencing.

Wind appeared before the district court to enter her guilty pleas. At the plea hearing, the district court advised Wind of the maximum potential penalties she faced. The court specifically noted that each count carries a maximum potential term of imprisonment of ten years and that the sentences may be imposed consecutively. Wind stated she understood she could be sentenced to twenty years.

C. Sentencing

In anticipation of sentencing, the United States Probation Office prepared a Presentence Investigation Report (PSR). The PSR outlined conduct relevant to the offenses to which Wind pled guilty, listed behavior that did not qualify as relevant

conduct—including a description of events related to dismissed Count III, cataloged Wind's criminal history, provided background information about Wind and her family, and applied the United States Sentencing Guidelines to Wind's offenses. The PSR listed Wind's total offense level as 21 and her criminal history category as I, resulting in an advisory Guidelines range of 37 to 46 months. The PSR listed two potential grounds for departure from that advisory Guidelines range: a § 5K2.10 downward departure due to the victim's conduct in provoking the offense behavior and a § 5K2.21 upward departure based upon the conduct underlying dismissed Count III.

Wind filed numerous objections to the PSR. Wind specifically challenged the PSR's descriptions and conclusions related to Pickner's death on June 5, 2004. Her remaining objections primarily challenged the accuracy or completeness of the PSR's descriptions of alleged prior acts of violence by Wind. The government did not object to the PSR.

Over the course of a number of months, the district court held a sentencing hearing. During the hearing, both the government and Wind presented evidence related to dismissed Count III. In fact, the vast majority of the sentencing proceeding was dedicated to the events of June 5, 2004. The evidence showed that on June 4, 2004, Pickner and Wind were together at the Crow Creek Casino; both were drinking alcohol. At some point they had an argument and separated. Pickner and his brother, Michael Todd Red Bear, ended up at a friend's house and kept drinking throughout the night. The next morning, Wind borrowed a car from a friend and went to find Pickner. She picked Pickner up from the friend's house and drove him back to her house. Red Bear rode along with Wind and Pickner. Pickner and Wind entered Wind's house, and Red Bear walked to a nearby home.

Less than thirty minutes later, two of Wind's young children found her injured in her home. Medical personnel and law enforcement officers responded. Wind was

taken to the hospital for treatment. She had seven stab wounds on her left arm and back, one of which punctured her lung. Pickner was found dead on the bed. He had three wounds: one stab wound on the left side of his chest that penetrated his heart and two incise knife wounds on top of his forehead. Pickner's blood alcohol level was .296.

The parties agreed on this basic outline of events. They reached different conclusions on the circumstances surrounding Pickner's death, however. The government contended Wind killed Pickner while he was asleep or passed out on the bed and then stabbed herself to make it look like she acted in self defense. Wind argued the evidence supported a conclusion that Wind stabbed Pickner in self defense. Both sides put on evidence in support of their theories. The government presented testimony from various law enforcement agents, medical personnel, and other experts. Wind countered with testimony from Wind's treating physician, a forensic pathologist, and an independent forensic science consultant. These witnesses presented conflicting testimony about the seriousness of Wind's injuries, the likelihood that Wind's wounds were self-inflicted, the timing and order of the various stab wounds, and Pickner's location and orientation when he was stabbed.

The remaining evidence presented at the sentencing hearing addressed Wind's character, propensity for violence, and alleged prior acts of violence. The government's evidence included testimony from Pickner's brothers about Wind's violent behavior during their days as students together in elementary and middle school. Tom Pickner testified that Wind stabbed him in the leg with a pencil and stated Wind bullied students for their lunch money. Witnesses testified to instances of Wind biting people, including her then-husband Leonard Azure. Randy Pickner testified that in January 2003, Wind attempted to stab Rick Pickner in the back. Wind had thrown Pickner's belongings from the house, and while Randy helped his brother gather his things, Wind lunged at Rick Pickner with a knife. A social worker who had worked with Wind and her family testified that Wind "threatened to kill [her]."

Wind presented evidence at the sentencing hearing to provide context to the various allegations of violence included in the PSR and testified to at the sentencing hearing. Viola Obago, Wind's aunt, testified to violence Wind suffered at Pickner's hand, as did Delores Sazue and Deb Attikai. Viola Obago stated she had witnessed Pickner kick, knock, drag, hit, and beat Wind. A neighbor boy testified to watching Pickner drag Wind along the ground with her shirt ripped off. Wind's treating physician testified to treating Wind for injuries suffered when Pickner kicked her in the face. Russell Obago testified that, on the day that Wind struck him with the barbeque fork, Pickner hit Wind and threw her against the wall prior to Wind grabbing the fork. Wind also highlighted portions of the PSR that demonstrated Leonard Azure had been violent with her, as well.

During the course of the hearing, the district court commented on its reservations about this case. First, the court expressed a concern about the investigation into Pickner's death. The court described the investigation as "fouled up," "sloppy," "a mess," and "botched." The court concluded "the constitutional rights of the Defendant were violated" and noted that much of the government's evidence would have been suppressed had Count III proceeded to trial. Second, the court was "troubled by the tail wagging the dog," noting that Wind had pled guilty to "two penny-ante assaults with a dangerous weapon" and that those convictions were being converted into a sentencing hearing for murder.

As the lengthy hearing came to a close, the court recalled the evidence presented, made certain findings of fact, and declined to make other findings. The court concluded, "If Mr. Pickner stabbed the Defendant and then laid down or passed out on the bed while heavily intoxicated, it is certainly possible that the Defendant stabbed him while he was unconscious and killed him. And I find that she did that, that she stabbed him while he was unable to defend himself." The court also stated "whether [Pickner] assaulted [Wind] before or after or during the assault on him or whether she inflicted the stab wounds herself, so what." The court emphasized that

-6-

he believed the timing of Wind's injuries was immaterial and declined to make a finding of fact as to any claim of self defense. However, the court explained it was uncertain how to allocate the burden of proof: "Normally, of course, it's the burden of the Government to prove there was no self-defense. That's the way it works in a trial. I don't know how it works in a sentencing hearing. Everything's topsy-turvy, I guess, in these sentence hearings."

The court adopted the Guidelines calculation included in the PSR, with the applicable Guidelines range of 37 to 46 months. The court found the applicable criminal history category I insufficient to reflect Wind's past criminal conduct or the likelihood that she would commit acts of violence in the future and therefore departed upward pursuant to § 4A1.3. The court found that "a Criminal History Category of VI is appropriate as to this Defendant, taking into account her past long and detailed history of violence, including the use of dangerous weapons, knives, forks, and other things, biting people." With this departure from the lowest criminal history category to the highest, Wind's new advisory range was 77 to 96 months.

The court then discussed the factors outlined in 18 U.S.C. § 3553(a). As to the nature and circumstances of the offense, the district court described Wind's counts of conviction as "relatively minor." The court focused on the history and characteristics of the defendant and the need to afford deterrence, promote respect for the law, and protect the public from further crimes by the defendant. The court noted "if you're simply looking at the offenses of conviction here, the upward departure that I have indicated would not be appropriate, but for the finding of the Court that the public needs to be protected from further crimes of this Defendant." The court stated that the need to avoid unwarranted sentence disparities did not apply, because "this Defendant's record is very unusual."

Having discussed the § 3553(a) factors, the court considered whether to impose concurrent or consecutive sentences. The court acknowledged that, generally,

sentences imposed at the same time are to be imposed concurrently. The court cited 18 U.S.C. § 3584 and Guidelines § 5G1.2 as guiding its decision regarding imposing concurrent or consecutive sentences. The court determined it would impose consecutive sentences and ordered Wind to a term of imprisonment of 96 months on Count I, to be followed by a term of 84 months for Count II. Thus, each individual sentence was within the adjusted advisory Guideline range, but the total length of imprisonment of 180 months constituted a substantial upward variance from the range. This appeal followed.

II.     Discussion

Wind raises a number of challenges to the sentence imposed by the district court. First, she challenges the upward departure based upon under-represented criminal history. Second, Wind challenges the court's reliance upon dismissed Count III for sentencing purposes. Third, Wind alleges the court erred in its ruling on her objections to the PSR. Fourth, Wind argues the court erred in imposing consecutive sentences. Fifth, Wind alleges her ultimate sentence of 180 months' imprisonment is unreasonable. The government contends this court may only consider Wind's final argument as to the reasonableness of Wind's ultimate sentence because the appeal waiver covers her remaining arguments. We address those issues necessary for resolution of this appeal.

A.     Appeal Waiver

As a threshold matter we must determine whether Wind waived the right to pursue the arguments she raises on appeal. "As a general rule, a defendant is allowed to waive appellate rights." United States v. Andis, 333 F.3d 886, 889 (8th Cir. 2003) (en banc). In determining whether particular claims are included under an appeal waiver that was entered into knowingly and voluntarily by a defendant, we strictly construe the provision and read any ambiguities against the government "and in favor

of a defendant's appellate rights." Id. at 890. The government bears the burden to prove "that a plea agreement clearly and unambiguously waives a defendant's right to appeal." Id.

The pertinent part of the plea agreement reads: "The parties agree that expressly excluded from this waiver of defenses and appeal rights is the defendant's right to appeal the sentence for a determination of 'reasonableness' should the Court impose a sentence above the advisory Guidelines range established by the Court for the offense." In interpreting identical language in another plea agreement, we found "the range established by the Court" to be ambiguous and, resolving the ambiguity in favor of the defendant, assumed the plea agreement permitted the defendant to challenge an upward departure from the range originally established by the district court. United States v. Kemp, 530 F.3d 719, 723 (8th Cir. 2008). We adopt the same approach here. Thus, the applicable Guidelines range is 37 to 46 months, which Wind does not challenge. Instead, Wind challenges the upward departure from that range, alleging procedural and substantive errors by the district court in reaching its ultimate sentence—a sentence Wind contends is unreasonable. The Supreme Court's decision in Gall v. United States, 128 S. Ct 586 (2007), teaches that appellate review for reasonableness includes both procedural and substantive components. Id. at 597. Wind's preserved right to appeal for a "determination of 'reasonableness'" therefore encompasses the arguments she now asserts. See, e.g., United States v. Mousseau, 517 F.3d 1044, 1048–49 (8th Cir. 2008) (considering the district court's factual findings underlying an upward departure and whether the district court erred in departing, as well as determining the reasonableness of the sentence, when the plea agreement contained the same plea waiver language at issue here); United States v. Shafer, 438 F.3d 1225, 1227 (8th Cir. 2006) (reviewing a district court's imposition of a concurrent sentence, rather than a consecutive sentence, for reasonableness).

B.     Procedural Reasonableness

The Supreme Court's decisions in United States v. Booker, 543 U.S. 220 (2005), Rita v. United States, 127 S. Ct. 2456 (2007), and Gall, 128 S. Ct. 586, guide our consideration of the sentencing issues presented in this case. We review the sentence for reasonableness. Gall, 128 S. Ct. at 594. Reasonableness review requires us to "first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." Id. at 597. This list of potential procedural errors is not exhaustive, and other procedural errors may be considered, as well. See United States v. Desantiago-Esquivel, 526 F.3d 398, 401 (8th Cir. 2008) (concluding that the list of "procedural impediments" in Gall is not "all inclusive"). If the decision was "procedurally sound," we then review the "substantive reasonableness of the sentence," applying an abuse-of-discretion standard and considering the totality of the circumstances. Gall, 128 S. Ct. at 597.

Within this framework, we first consider whether the district court committed any significant procedural error. We find it necessary to address two of the alleged errors of procedure: (1) whether the district court erred in departing upward based upon under-represented criminal history and (2) whether the district court erred in relying upon dismissed Count III at sentencing.

1.     Criminal History Departure

The Gall Court made clear that the Guidelines remain "the starting point and the initial benchmark" in reviewing a sentence. Id. at 596. Thus, our discussion begins with the district court's upward departure from criminal history category I to

category VI pursuant to § 4A1.3. We review traditional departures from the advisory Guidelines range for abuse of discretion. United States v. Rouillard, 474 F.3d 551, 555 (8th Cir. 2007).

Section 4A1.3 permits an upward departure if "reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(a)(1). "When contemplating and structuring such a departure, the district court should consider both the nature and extent of a defendant's criminal history." United States v. Hacker, 450 F.3d 808, 812 (8th Cir. 2006). The extent of the departure should be determined "by using, as a reference, the criminal history category applicable to defendants whose criminal history or likelihood to recidivate most closely resembles that of the defendant's." § 4A1.3(a)(4)(A). We have previously described the process a court should use to determine the extent of a departure based upon underrepresented criminal history:

> To impose an upward departure under § 4A1.3, the sentencing court first must proceed along the criminal history axis of the sentencing matrix, comparing the defendant's criminal history with the criminal histories of other offenders in each higher category . . . .

United States v. Collins, 104 F.3d 143, 145 (8th Cir. 1997) (quoting United States v. LeCompte, 99 F.3d 274, 280 (8th Cir. 1996)). This process does not "require a ritualistic exercise in which the sentencing court mechanically discusses each criminal history category it rejects en route to the category that it selects." United States v. Day, 998 F.2d 622, 625 (8th Cir. 1993) (internal quotation and alteration omitted). However, the court must "adequately explain[]" why it concludes the intermediary categories fail to meet the purposes of § 4A1.3. Id.; see also Collins, 104 F.3d at 145 ("Although the district court did not specifically mention that it had considered each intermediate criminal history category, its findings were adequate to explain and support the departure in this particular case.").

The PSR calculated Wind's criminal history category as falling within category I, the lowest possible category. She was assigned only one criminal history point, based upon a 2001 conviction for driving under the influence. The PSR reflects three other criminal convictions that did not receive points. The most serious of these non-counted offenses is a 1981 conviction for assault by striking, beating, and wounding, resulting in a term of imprisonment of six months, with four suspended. No criminal history points were assigned to this prior sentence because of its age. See U.S.S.G. § 4A1.2(e)(3). The district court specifically mentioned the lack of scoring of this conviction as a factor in determining Wind's criminal history category was insufficient. If the sentence had been imposed within the permissible time frame, it would have been assigned two criminal history points. See U.S.S.G. § 4A1.1(b) (imposing two criminal history points for prior sentences of at least sixty days). The other two convictions listed—for disorderly conduct and failing to have insurance—also were too old to factor into Wind's criminal history score. However, it is unlikely either conviction would have been assigned any criminal history points even if they were not time-barred. See U.S.S.G. § 4A1.2(c)(1) (listing disorderly conduct and other petty offenses as generally excluded from criminal history calculations). Thus, if one counts Wind's time-barred convictions, she would have three criminal history points, resulting in a criminal history category II.

A sentencing court need not only rely upon uncounted prior convictions in determining underrepresented criminal history, however. The Guidelines allow a district court to consider "reliable information" demonstrating the criminal history category assigned to a defendant does not accurately reflect her actual criminal history or the likelihood that she will commit additional crimes. U.S.S.G. § 4A1.3(a)(1). Among other things, a sentencing court may consider "[p]rior similar adult criminal conduct not resulting in a criminal conviction," in making this determination. U.S.S.G. § 4A1.3(a)(2)(E); see also Collins, 104 F.3d at 145 ("Uncharged conduct can properly be considered when departing under U.S.S.G. § 4A1.3."). Here, the district court heard testimony at sentencing about Wind's prior assaults and considered

material included in the PSR showing aggressive behavior. The court relied on Randy Pickner's testimony about Wind's attempt to stab Rick Pickner after she threw his belongings out of their house. The court credited David Powers's testimony that Wind assaulted a woman by biting her. The court looked to Wind's "history of violence while in school," which involved bullying, stealing lunch money, and stabbing with a pencil when Wind was in elementary and middle school,[3] as testified to by Tom Pickner. The court noted that the PSR and the testimony at sentencing demonstrates that Wind is violent and angry when she drinks alcohol.

The court departed upward to criminal history category VI from category I, "taking into account [Wind's] past long and detailed history of violence, including the use of dangerous weapons, knives, forks, and other things, biting people." The court did not attempt to assign hypothetical criminal history points to the conduct that did not result in convictions, and then determine what the appropriate criminal history category would be. Nor did the court discuss intermediary categories II, III, IV, or V before deciding upon category VI. While the district court is not required to engage in a "ritualistic exercise in which the sentencing court mechanically discusses each criminal history category it rejects en route to the category it selects," Day, 998 F.2d at 625 (internal quotation and alteration omitted), the court must provide sufficient indicia of why the intermediary categories are inappropriate. This is particularly important when the upward departure takes the defendant from the lowest to the highest criminal history category. The court also did not compare Wind's criminal history with that of other defendants who are assigned criminal history category VI. See United States v. Anderson, 886 F.2d 215, 216 (8th Cir. 1989) (per curiam)

---

[3] We have not found a case that discussed elementary school bullying as a grounds for an upward departure for underrepresented criminal history. The fact we have not seen the issue discussed does not preclude its use. However, use of elementary school conduct, on the playground no less, gives us pause. If the district court decides to rely upon this conduct on remand we suggest the court explain why and how it was relied upon.

(reversing and remanding for resentencing a sentence with an upward departure to criminal history category VI when the district court failed to compare the defendant's criminal history with the histories of other defendants who fall within that category). Such a comparison would provide support for the court's decision to use category VI, as opposed to an intermediary category.

Wind had only one prior relatively serious conviction. Much of the other conduct the court relied upon as grounds for the upward departure were alcohol-related assaults, and many of them were instances of mutual aggression in domestic violence situations. Others were actions during Wind's childhood. Without the benefit of additional analysis by the district court, we cannot conclude that the district court's "findings were adequate to explain and support the departure in this particular case." Collins, 104 F.3d at 145. Failing to adequately explain an upward departure is a significant procedural error, as is improperly calculating the advisory Guidelines range. Gall, 128 S. Ct. at 597. Because, on this record, we conclude the district court abused its discretion in determining the extent of the upward departure based upon underrepresented criminal history, we must remand.

2.      The District Court's Use of Dismissed Count III at Sentencing

In this case, dismissed Count III featured prominently in the court's consideration of Wind's sentence.[4] A sentencing court may rely upon dismissed charges in fashioning a reasonable sentence. See U.S.S.G. § 5K2.21 (providing for

---

[4] The court marked § 5K2.21 (dismissed and uncharged conduct) as one of the grounds for its upward departure in its written statement of reasons. In its oral pronouncements and the narrative portion of the written statement of reasons, however, the court seemed to rely upon dismissed Count III primarily as a justification for imposing consecutive sentences. Because we conclude reliance upon Count III at sentencing was in error for the reasons articulated herein, the exact use of the dismissed count is irrelevant.

the use of dismissed or uncharged conduct at sentencing, if the conduct was not used to determine the pre-departure Guidelines range). A dismissed charge may even be relied upon if it was dismissed as part of a plea agreement in the case. See United States v. Left Hand Bull, 477 F.3d 518, 521 (8th Cir. 2006) (stating that defendant did not lose the benefit of his plea bargain when dismissed charge was relied upon for an upward departure at sentencing). In order to rely upon a dismissed charge for purposes of sentencing, the government must prove the defendant committed the alleged offense by a preponderance of the evidence. See United States v. Bradford, 449 F.3d 910, 919-20 (8th Cir. 2007) (discussing the preponderance of the evidence standard). In addition, "the government has the burden to prove the absence of any defense by a preponderance of the evidence." United States v. Betts, 509 F.3d 441, 445 (8th Cir. 2007). Thus, although the quantum of proof is less than the beyond-a-reasonable-doubt formulation used at trial, the burden of proof remains unchanged at sentencing: the government bears the burden.

The district court did not correctly apply the burden of proof when considering the absence of self defense as related to the conduct underlying dismissed Count III. Count III alleged that Wind "willfully, deliberately, and with premeditation and with malice aforethought" killed Pickner "by stabbing him in the chest with a knife." At the sentencing hearing, Wind countered this murder charge by raising self defense as a justification for Pickner's death. The court acknowledged that the government bears the burden of proving an absence of self defense once the issue is called into question during a trial, but indicated it was unsure of the proper allocation of the burden of proof when considering the issue at sentencing. This was a significant procedural error. After self defense became an issue at sentencing, the government bore the burden of establishing Wind did not act in self defense by a preponderance of the evidence.

The failure to correctly assign the burden of proof on the question of self defense calls into question the court's conclusion that "she stabbed him while he was

unable to defend himself." We do not know if the court concluded the government successfully proved a lack of self defense, or if the court concluded Wind failed to show she stabbed Pickner in self defense. The court's statement that "it is certainly *possible* that the Defendant stabbed him while he was unconscious and killed him" gives us pause. We are also troubled by the court's refusal to specifically make a finding of fact on self-defense. The court emphasized that there was "no indication of any third person being involved here," without resolving the "evidence . . . in dispute" as to the circumstances surrounding the stab wounds inflicted upon Wind. A finding of fact as to Wind's claim of self defense was a necessary prerequisite to considering the dismissed charge as a factor in Wind's sentencing.

The evidence at sentencing as to the circumstances of Pickner's death was conflicting, as the district court acknowledged. Much of the uncertainty dealt with seriousness of Wind's injuries, the likelihood that Wind's wounds were self-inflicted, the timing and order of the various stab wounds, and Pickner's location and orientation when he was stabbed. For example, two witnesses presented by the defendant, Dr. John Jones, Wind's treating physician, and Dr. Lindsey Thomas, a forensic examiner who reviewed Wind's medical records and other materials, described Wind's wounds as severe and life threatening. Dr. Thomas stated that, in her opinion and based upon a reasonable degree of medical certainty, Wind "did not stab herself." Dr. Jones reached the same conclusion. His opinion was based both upon his examination and treatment of Wind's wounds and upon his knowledge of Wind's severe aversion to needles and shots. In contrast, Raymond Pierce, a retired New York City Police Department Homicide Detective called by the government as an expert, testified that he concluded Wind's wounds were self-inflicted.

Based upon the evidence presented at sentencing, we cannot conclude that the district court's failure to properly assign the burden of proof did not impact the court's findings related to Pickner's death. Moreover, the district court relied upon its conclusion that Wind stabbed Pickner when he was unable to defend himself in

determining Wind's sentence, specifically referencing this conclusion in its oral pronouncements at the sentencing hearing, as well as in its written statement of reasons. This procedural error cannot be considered harmless, and we must remand.

C.      Substantive Reasonableness and Remaining Arguments

Because we conclude the sentence imposed suffered from the above stated procedural flaws, we need not consider the substantive reasonableness of the ultimate sentence imposed by the district court. See United States v. Pepper, 518 F.3d 949, 953 (8th Cir. 2008). We also refrain from addressing other arguments Wind raises that are intertwined with that ultimate determination.

III.   Conclusion

For the foregoing reasons, we vacate Wind's sentence and remand for resentencing consistent with this opinion.

_____